**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | |
| - against - | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01778 |
| Plaintiff, | |
| - against - | |
| ERIC T. SCHNEIDERMAN, as successor to ANDREW M. CUOMO, Attorney General of the State of New York; BART M. SCHWARTZ, as Receiver for ARIEL FUND LTD. and GABRIEL CAPITAL, L.P.; DAVID PITOFSKY, as Receiver for ASCOT PARTNERS L.P., ASCOT FUND, LTD.; J. EZRA MERKIN; and GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

**DECLARATION OF DAVID N. ELLENHORN IN SUPPORT**
**OF DEFENDANTS' JOINT MOTION TO WITHDRAW THE REFERENCE**

DAVID N. ELLENHORN, an attorney duly admitted to practice in the State of New York, and a member of the bar of this Court, hereby declares the following to be true and correct, under penalty of perjury:

1.   I am a Senior Trial Counsel in the Office of the Attorney General of the State of New York.  I have been in charge of the AG's action against J. Ezra Merkin, and his solely-owned management company, Gabriel Capital Corp. ("Merkin"), since inception.  I submit this declaration to provide a context to the pending motion to withdraw the reference.

**The AG's Action**

2.   Merkin was the general partner of Ascot Partners, L.P. and Gabriel Capital, L.P. and an investment advisor to Ascot Fund Limited and Ariel Fund Limited (collectively, the "Funds"). The assets of the two Ascot Funds were wholly invested with and controlled by Bernard Madoff, almost from their inception in 1992, and between 25% and 30% of the Ariel and Gabriel assets generally were invested with Madoff.

3.   In 2009, following a four-month investigation in which the AG reviewed thousands of documents, deposed Merkin and others, and interviewed hundreds of Merkin investors, the AG filed a complaint against Merkin in New York Supreme Court alleging violations of the Martin Act, Executive Law §63(12), the Not-for-Profit Corporation Law, and common-law causes of action.  The case was assigned to Justice Richard B. Lowe, III.  On May 28, 2009 the AG filed an amended complaint which added the Funds as Relief Defendants.

4.   The Complaint alleged, in substance, that Merkin had systematically misled investors by assuring them that he, and he alone, was actively managing their investments, when, in fact, he had delegated all investment responsibility to Madoff for the Ascot Funds, and all Ariel and Gabriel assets to Madoff and other undisclosed managers.  For example, an Ascot Offering

Memoranda stated that "All decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin."  In fact, the Ascot Funds actually were managed by Madoff.  In addition, Madoff's role was concealed by Merkin in various oral conversations with investors and potential investors.  The Complaint also alleged that Merkin breached his fiduciary duties by failing to conduct appropriate due diligence and supervision of Madoff's activities.

5.   Within days of filing the Complaint, the AG obtained a freeze order against Merkin's assets to prevent their dissipation, and in May and June 2009, the AG obtained receivership orders removing the Funds from Merkin's control and placing them under the authority of the New York Supreme Court.  Bart Schwartz of Guidepost Partners was appointed receiver of the Ariel and Gabriel funds, and David Pitofsky of Goodwin Procter appointed receiver of Ascot Partners, L.P.  Subsequently, the AG and the Receivers conducted an extensive analysis of Merkin's assets, including his bank accounts, investment holdings, and corporate and personal records.

6.   On July 1, 2009, Merkin filed a motion to dismiss the Complaint.  The AG responded on August 3, 2009.  In a February 8, 2010 decision, Justice Lowe denied Merkin's motion to dismiss in its entirety.  The Court found that the AG had pled sufficient facts showing that Merkin had misled investors in violation of the Martin Act and Executive Law §63(12), and failed to conduct appropriate due diligence, in breach of his fiduciary duties.  A copy of the decision is annexed hereto as Exhibit A.

7.   From April 2009 through September 2010, the parties took additional discovery, and, on October 18, 2010, the AG filed a motion for partial summary judgment seeking recovery of fees

Merkin had received from the Funds and other relief. After extensive briefing, the motion was argued in February 2011.

### Settlement Discussions Between Merkin, the AG and the Receivers

8.   Beginning in early 2010, Merkin and the AG engaged in extensive settlement negotiations. The Receivers also participated. After over a year of negotiations they reached a settlement and a settlement agreement was executed in December 2011. Under this agreement, Merkin was to pay $415 million to the AG for distribution to the Funds' investors by the Receivers. The Agreement was conditioned, however, on Merkin and the Funds receiving a release from claims made against them by the SIPC Trustee, Irving Picard. In order to facilitate the Trustee's provision of releases, the Trustee was given a copy of the settlement agreement, and in December 2011 one of my colleagues and I met with David Sheehan and Tom Long of Baker Hostetler to explain to them the mechanics and terms of the agreement.

### Settlement Discussions Between the Receivers, Merkin and the Trustee

9.   Over the next four months, the Receivers and counsel for Merkin sought to negotiate a settlement of the Trustee's claims against Merkin and the Funds. These efforts included numerous meetings between the Receivers and the Trustee's counsel, in which there was full disclosure of Merkin's assets, liabilities, and financial condition. While these negotiations were taking place, the parties asked Justice Lowe to withhold his decision on the AG's summary judgment motion, and the Court did so. However, the Trustee rejected or failed to respond to various offers made by the Receivers and Merkin, and, I am informed, declined to make any counter-offer. At the end of April 2012, the Trustee's attorneys stated that the Trustee was not interested in further negotiations.

**The Merkin Settlement Agreement**

10. As a result, the settlement agreement with Merkin was renegotiated so that the Trustee's release of Merkin and the Funds would no longer be required. On June 13, 2012 , a new agreement was executed by the AG, Merkin, and the Receivers.

11. The final Settlement Agreement provides that Merkin will return $410 million in fees he received from the Funds to settle the AG's claims. The bulk of these moneys will be distributed to eligible investors to compensate them for cash losses they suffered. Pursuant to the Agreement, all eligible investors will receive 42.5% of the first $5 million of their cash losses. Large investors (defined as investors with more than $5 million in cash losses) may submit to a simple process which will determine whether they knew that Merkin had delegated investment responsibility to Madoff. Those large investors who were not aware of this delegation may participate in a 'large investor settlement pool' which could provide up to 42.5% of their net losses *above* $5 million. (Large investors who do not wish to participate in this claims process or had knowledge of Madoff's role and do not seek to qualify, will instead receive an additional 2.5% of their net losses above $5 million.) Contrary to the Trustee's Complaint, this process is neither "complex" nor "costly" and is expected to involve very few investors. The claims process will be overseen by an independent settlement fund administrator and is expected to be conducted at minimal cost.

12. The settlement funds will be distributed to investors in two stages. The first distribution will occur approximately six months after the closing, and will be funded by approximately $200 million that was realized from the sale of an art collection Merkin owned jointly with his wife, which was escrowed by an order of the New York court. The second stage will take place on a rolling basis over the next three years, and will be funded through the ongoing liquidation of

Merkin's interests in the Ariel and Gabriel portfolios, under the direction of their Receiver. No moneys will be distributed until months after the closing of the Settlement Agreement, which the AG has voluntarily agreed to postpone until the Trustee's motion for a preliminary injunction is heard.

### The Trustee and the AG

13. On May 6, 2009, the Trustee sued Merkin and the Funds to recover allegedly fraudulent transfers made to the Funds by Madoff. An amended complaint was filed on December 23, 2009 to add a count to recover moneys transferred from the Funds to Merkin.

14. In November 2009, the Trustee informed the AG that he would seek to enjoin the AG's action against Merkin unless the AG agreed to turn over any funds he might obtain from Merkin to the Trustee. The AG declined to provide such assurances and provided the Trustee with reasons why the Trustee could not enjoin his enforcement action against Merkin. In addition, the AG invited the Trustee to enter into negotiations to settle their differences. After some preliminary discussions, the Trustee failed to respond to the AG's invitation to continue negotiations.

15. In mid-2011, I received a telephone call from Marc Powers, one of the Trustee's attorneys. He told me that he had heard that the AG was close to a settlement with Merkin, and if the AG did not agree within forty-eight hours that the Bankruptcy Court would have exclusive jurisdiction over any disputes between the Trustee and the AG, the Trustee would sue the AG to enjoin implementation of any settlement with Merkin. I told Mr. Powers that the AG would not agree to this demand but would be willing to discuss the matter with the Trustee. He responded that he would call me in a day or two to set up a meeting, but I never heard from him again.

16. In June 2012, after the AG publicly announced the settlement with Merkin, I received a request from one of Picard's counsel for a copy of the Settlement Agreement.  We considered providing the Trustee with a copy, but ultimately decided not to do so because we believed it would prejudice the Funds in their defense of Trustee's lawsuit against them.  I did however assure counsel that no funds would be distributed pursuant to the settlement agreement for many months.  In addition, the principal terms, including those relating to the distribution of proceeds to investors, remained unchanged in the final Merkin Settlement from the December version provided to the Trustee.

17. On August 1, 2012, without notice, the Trustee sued the AG for a declaration that the AG's suit against Merkin is void *ab initio*.  The Complaint seeks an injunction preventing the AG from completing the settlement or distributing any of Merkin's assets pursuant to the settlement.

18. In his Complaint, the Trustee alleges that the AG seeks to "abrogate" the "fundamental tenet" of SIPA and the Bankruptcy Code that "every victim should be treated equally" because, the Trustee claims, Merkin's assets should be distributed to all Madoff investors.  In fact, that would have the effect of providing direct Madoff investors with a higher percentage recovery than Merkin investors would receive.  The Merkin settlement funds are to be distributed to parties who did not invest with Madoff and were not customers of BLMIS but, rather, with Merkin, and they are in an entirely different category from Madoff's direct investors.  Among other things, SIPC provides up to $500,000 to each direct Madoff investor starting from the first dollar of losses.  Soon after the Madoff fraud was disclosed, the Trustee announced that indirect Madoff investors, such as investors in Ascot, Ariel, and Gabriel, are ineligible for any SIPC payments.

19. Hundreds of Merkin investors had cash losses of $500,000 or less.  Had they been direct Madoff investors and received SIPC payments they would have recovered the bulk of their losses.  Instead, they will receive distributions from the AG's settlement and whatever money, if any, the Trustee ultimately distributes to the Funds, following resolution of his claims against the Funds, and theirs against him.

20. As shown in the AG and Receivers joint memorandum of law, the Trustee has no right to enjoin or interfere with the Merkin settlement.  The Trustee himself admits that his claim is "unusual, if not extraordinary" and it is unsupported by legal precedent.  It is also inequitable.


Dated: New York, NY
          August 31, 2012

                                             _____/s/David N. Ellenhorn_____
                                                  David N. Ellenhorn

EXHIBIT A
to

**DECLARATION OF DAVID N. ELLENHORN IN SUPPORT
OF DEFENDANTS' JOINT MOTION TO WITHDRAW THE REFERENCE**

Page 1

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

C

NOTE: THIS OPINION WILL NOT APPEAR IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.

Supreme Court, New York County, New York.
The PEOPLE of the State of New York By Andrew M. CUOMO, Attorney General of the State of New York, Plaintiff,
v.
J. Ezra MERKIN and Gabriel Capital Corporation, Defendants.
**No. 450879/09.**

Feb. 8, 2010.

Sangeap, Daniel, Rosen, Harriet B., Kadosh, Shmuel, for Claimant/Plaintiff/Petitioner The People of the State of New York by Andrew M. Cuomo, Attorney General of the State of New York.

Steiner, Neil A., Mennitt, Gary J. Esq., Levander, Andrew J., for Merkin, J. Ezra and Gabriel Capital Corporation.

Laffey, Casey D., Tulchin, Matthew T. Pitofsky, David B., for Ascot Partners L.P. (Relief Defendants).

Laffey, Casey D., Bensky, Eric A., Schiffman, Howard, for Ascot Fund Limited (Relief Defendants), Gabriel Capital L.P. (Relief Defendants), Ariel Fund Limited (Relief Defendants), Gabriel Assets LLC (Relief Defendants) and Gabriel Alternative Assets LLC (Relief Defendants).

Kaswan, Beth A., New York University, individually and derivatively (non-party).

RICHARD B. LOWE, J.

**\*1** Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") move for an order dismissing the complaint pursuant to CPLR 3211 (a)(1) and (7).

The Attorney General ("AG") is bringing this action against Merkin and his investment management company, based on violations of the Martin Act, Executive Law § 63(12), the Not-for-Profit Corporation Law and common-law claims. Allegedly, Merkin made misrepresentations and omissions to investors, including many charities, who entrusted him with their money. The AG further alleges that Merkin blindly fed the investors' funds into a Ponzi scheme orchestrated by Bernard L. Madoff ("Madoff") while claiming that Merkin was actively managing those funds. Merkin also allegedly failed to conduct adequate due diligence of Madoff's activities, despite information given to him indicating that Madoff may have been engaged in misconduct. According to the complaint, Merkin's investors lost over $1.2 billion, while he collected more than $470 million in management and incentive fees from his funds including: Ascot Partners L.P., Ascot Fund Limited, Ariel Fund Limited, and Gabriel Capital L.P.

### BACKGROUND

Accepting the allegations of the complaint as true ( Leon v. Martinez, 84 N.Y.2d 83 [1994] ), the following facts emerge: Defendant Merkin is the general partner of Ascot Partners, L.P. and Gabriel Capital, L.P. ("Gabriel"), domestic hedge funds. Merkin is the sole shareholder and director of GCC (Complaint, ¶¶ 16-17). GCC serves as the manager of Ascot Fund Limited ("Ascot") and Ariel Fund Limited ("Ariel"), both of which are offshore funds. Merkin collected annual management fees equal to 1% of the capital invested in Ariel, Gabriel, and Ascot. In 2003, Merkin raised the Ascot management fee to 1.5% of the capital invested (id., ¶ 24). He also collected an annual incentive fee of 20% of any appreciation in the assets of Gabriel and Ariel ( id.).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

Merkin and Madoff met in the late 1980s, early 1990s (*id.,* ¶ 26). In the early 1990s, Madoff described to Merkin his investment strategy, known as a "split strike conversion strategy," in which Madofff would buy stocks from the S & P's 100 Index, and simultaneously, buy put options below the current stock price to protect against large decreases, and sell call options above the current price to fund the purchase of the put options (*id.,* ¶ 27). Madoff claimed that he could produce steady returns of 10% per year no matter what the market was doing overall (*id.*).

In 1988, Merkin established Ariel and Gabriel (*id.,* ¶ 66). By 2008, Gabriel had approximately 200 investors with $1.4 billion under management, and Ariel had 78 investors with about $1.3 billion under management (*id.*). From 2001 to 2008, between 20-30% of the assets of Gabriel and Ariel were managed by Madoff (*id.,* ¶¶ 67-79). The remainder of the assets were not managed by Merkin, but by third parties (*id.*). From 1989 to 2007, Merkin collected annual management and incentive fees from Gabriel that totaled approximately $277 million, and from Ariel approximately $242 million (*id.,* ¶ 69).

**\*2** According to the complaint, in 1992, Merkin created Ascot to serve solely as a feeder fund to Madoff, and substantially all of Ascot's assets were turned over to Madoff (*id.,* ¶ 32). Most of Ascot's investors were not aware that Ascot was a feeder fund for Madoff (*id.,* ¶ 33). Thirty-five non-profit organizations had invested $215 million of the $1.7 billion invested in Ascot by the end of 2008 (*id.,* ¶ 36). From 1995 through 2007, Merkin received management fees of $169 million from the Ascot Fund (*id.,* ¶ 35), and by 2008, Merkin was receiving annual Ascot management fees of approximately $25.5 million (*id.*).

The complaint alleges that after Madoff's arrest in December 2008, Merkin surprised Ariel and Gabriel investors by telling them, for the first time, that the funds had significant Madoff exposure. Thus, the Ariel and Gabriel investors were unaware of the true nature of the investment they were making (*id.,* ¶ 99).

Based on these and other more specific allegations of misrepresentations and omissions by Merkin, the AG has brought six causes of action. The first through third claims are for securities fraud under the Martin Act, General Business Law [GBL] § 352, 352-c (1)(a) and (c), and 353. The fourth claim, alleged only against Merkin, asserts violations of the Not-for-Profit Corporation Law §§ 112, 717, and 720. The fifth claim is for breach of fiduciary duty to the investors of Ascot, Ariel, and Gabriel, and seeks damages and disgorgement of compensation. The sixth claim, asserted under Executive Law § 63 (12), maintains that Merkin's and GCC's conduct constituted repeated fraudulent or illegal acts, or constituted persistent fraud in the transaction of business, and seeks restitution and damages.

The AG seeks to enjoin and restrain defendants from the alleged acts and practices, enjoin Merkin from serving as a general or managing partner, director or officer of any investment fund or otherwise managing investments, and enjoin him from serving as a board member, trustee, director or officer of any non-profit organization. The AG also seeks an accounting of all fees and other compensation, and to recover costs and attorneys' fees.

Merkin and GCC now move to dismiss the complaint in its entirety.

### DISCUSSION

On a motion to dismiss pursuant to CPLR 3211, the court's task is to determine whether the complaint states a cause of action. The motion will be denied if, within the four corners of the pleading, factual allegations are discerned which taken together manifest a claim cognizable at law ( *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 151-152 [2002] ). The complaint will be liberally construed, and the court will accept as true all facts in the complaint and in plaintiff's sub-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

missions in opposition to the motion (*id.* at 152). Plaintiff will be accorded the benefit of all possible favorable inferences (*id.*). "Dismissal under CPLR 3211(a)(1) is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law' " ( *id.,* quoting *Leon v. Martinez,* 84 N.Y.2d at 88).

### *Martin Act and Executive Law Claims*

**\*3** The Martin Act (General Business Law Article 23-A) prohibits various deceitful and fraudulent practices in the distribution, sale, exchange, and purchase of securities. Thus, it prohibits the use or employment of "[a]ny fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale" (General Business Law § 352-c [1][a] ). It also prohibits:

   (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;

   where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted

(General Business Law § 352-c [1][c] ). The Martin Act is remedial in nature and should be liberally construed ( *People v. Lexington Sixty-First Assocs.,* 38 N.Y.2d 588, 595 [1976] ). The terms "fraud" and "fraudulent practices" are given a broad meaning so that all deceitful practices, even acts "not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public" are covered (*id.* at 595). In addition, the AG need not prove in-

tent or reliance in a Martin Act claim ( *State of New York v. Sonifer Realty Corp.,* 212 A.D.2d 366, 367 [1st Dept 1995] [fraudulent practices need not constitute fraud in the classic common-law sense, and it is not necessary to show reliance] ).

In support of the Martin Act claim, the AG has plead that Merkin concealed and failed to disclose Madoff's role, and misrepresented Merkin's role in the funds' management. For example, the AG alleges that the offering documents, such as the Ascot Memoranda, falsely represented that Merkin was involved in the fund's day-to-day management, and that the success of the fund depended on Merkin's abilities as a money manager. The Memoranda stated, for example, that he exclusively made the capital management decisions using his skill and experience, and that he would devote substantially all his time to managing its assets (Complaint, ¶¶ 39, 42-43). These documents could be construed as misrepresenting that Merkin would be controlling and actively managing the funds, and as concealing that Ascot was a feeder fund to Madoff (*id.,* ¶ 43).

The Ascot Memoranda, starting in 1996, indicated that multiple money managers might be used (*id.,* ¶ 45), which was false and misleading, because allegedly all of the funds were entrusted to a single money manager, Madoff (*id* ). The risk factors set forth in the Ascot Memoranda indicated a wide variety of investment strategies, none of which had anything to do with the "split strike conversion" strategy being employed by Madoff with the Ascot funds (*id.,* ¶ 46).

**\*4** While in the March 2006 Ascot Offering Memorandum, Merkin mentioned Madoff's name, by indicating that Madoff, was one of Ascot's two prime brokers, and that he cleared Ascot's transactions effected through other brokerage firms, this allegedly misrepresented Madoff's role because 98% of Ascot's transactions were both effected and cleared by Madoff, and Madoff had custody of over 99% of Ascot's securities holdings (*id.,* ¶ 47). Therefore, based on these allegations, the AG has adequately pleaded that these misrepresentations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

constitute fraudulent practices under the Martin Act.

Where the Martin Act claims are based on the defendant's omissions or failure to disclose, the omitted facts must be material-that is, that there is a substantial likelihood that the omitted fact would have assumed actual significance in the deliberations of a reasonable investor ( *State of New York v. Rachmani Corp.,* 71 N.Y.2d 718, 726 [1988] ). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available" ' (*id.,* quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 [1976]; *see also State of New York v. McLeod,* 12 Misc.3d 1157[A] *5, 2006 N.Y. Slip Op 50942*[U] [Sup Ct, N.Y. County 2006] ).

With respect to Merkin's alleged omissions in failing to reveal Madoff's actual role, and the actual investment strategy being employed, the complaint sufficiently pleads that these omitted facts are material, that is, that there is a substantial likelihood that disclosure of these facts would have been viewed by the reasonable investor as having significantly altered the total mix of information made available (*see id.,* ¶ ¶ 56, 57, 59). Materiality is a mixed question of fact and law. Therefore, it is inappropriate for resolution at the motion to dismiss stage (*see ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F3d 187, 197 [2d Cir2009]; *In re NovaGold Resources Inc. Sec. Litig.,* 629 F Supp 2d 272, 292 [SD N.Y.2009] ).

With regard to the Ariel and Gabriel Funds, the AG alleges misrepresentations with regard to the types of investments in which the funds would be involved. Thus, for example, the offering documents indicated that these funds focused on distressed debt and merger arbitrage, without disclosing that up to 30% of the funds were turned over to Madoff, who was using a completely different strategy.

In addition, the AG alleges misrepresentations and omissions regarding the ways in which the funds were going to operate. The offering documents indicated that Ariel did not use any self-clearing money managers. However, Madoff self-cleared all his transactions, and had custody of and managed a significant portion of Ariel's assets (*id.,* ¶ 82). Ariel's November 2002 Prospectus stated that brokers for the funds would not perform managerial or policy-making functions for the Fund (*id.,* ¶ 83, and Exhibit 23 annexed thereto). Madoff, however, was performing such managerial functions, and effecting, clearing, and settling transactions, all at the same time (*id.,* ¶¶ 83-84). The March 2006 Offering Memorandum stated that Morgan Stanley was the principal prime broker for Ariel, but this was false and misleading, because Morgan Stanley did not clear Madoff's trades, and was not the custodian for securities managed by Madoff.

**\*5** The AG also alleges oral misrepresentations by Merkin in which he or his employees denied that Ascot was managed by Madoff, denied that they were doing the same thing as Madoff, or minimized Madoff's role. The complaint also asserts that Merkin also made oral misrepresentations to an investor who was aware that Madoff was involved in Ascot, that Merkin required BDO Seidman, Ascot's auditor, to visit Madoff's offices two or three times a year to perform standard operational due diligence. In fact, however, BDO did not perform such due diligence or any other examination of Madoff's operation (*id.,* ¶ 63). The Ascot Subscription Agreement provided that the investors were given the opportunity to ask questions of, and receive answers from, the General Partner (Merkin and GCC) concerning matters pertaining to the investment. This essentially gives the investors the right to rely upon information the General Partner conveyed to the investor, orally or otherwise (*see Heller v. Goldin Restructuring Fund, L.P.,* 590 F Supp 2d 603, 615 [SD N.Y.2008] ). Taken together, all of these alleged oral and written misrepresentations sufficiently state a claim for fraudulent practices under the Martin Act.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

The defendants' reliance on a provision in the 2006 Offering Memoranda that Merkin might delegate investment management duties to independent money managers without first providing notice to, or obtaining the consent of, investors, is misplaced. They contend that any alleged misrepresentations were sufficiently balanced by this cautionary language. Defendants appear to be relying upon the "bespeaks caution" doctrine set forth in federal securities cases, which are persuasive authority in determining Martin Act claims (*see e.g. All Seasons Resorts, Inc. v. Abrams,* 68 N.Y.2d 81, 87 [1986] [in applying Martin Act, federal securities law cases are persuasive authority] ). Under this doctrine, misrepresentations or omissions "in conjunction with the purchase or sale of securities are considered immaterial where contained in communications or documents including cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable" ' and not actionable ( *United States SEC v. Meltzer,* 440 F Supp 2d 179, 191 [ED N.Y.2006] [citations omitted]; *see Halperin v. eBanker USA.com, Inc.,* 295 F3d 352, 357 [2d Cir2002] ). Generalized disclosures regarding unspecified risks, however, will not shield defendants from liability. Instead, regarding the prospective representations, the cautionary language must expressly warn of, and be specific and factual ( *Halperin v. eBanker USA.com, Inc.,* 295 F3d at 359). This doctrine is limited to forward-looking statements only, and is not applied to misrepresentations of present or historical facts which cannot be cured by cautionary language ( *P. Stolz Family Partnership L.P. v. Daum,* 355 F3d 92, 96-97 [2d Cir2004] ). The cautionary language warns investors that "bad things may come to pass-in dealing with the contingent or unforeseen future" (*id.* at 97). It, therefore, does not apply to historical or present fact knowledge, because "[s]uch facts exist and are known; they are not unforeseen or contingent" (*id.*). An offeror may not knowingly misrepresent historical facts and at the same time disclaim the misrepresented facts with cautionary language ( *id.; Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F Supp 2d 407, 419 [SD N.Y.2000], *abrogated on*

*other grounds In re IPO Securities Litigation,* 241 F Supp 2d 281, 352 n 85 [SD N.Y.2003] [a defendant cannot use the bespeaks caution doctrine where it knew that its statement was false when made] ).

**\*6** The misrepresentations at the center of this complaint involve Madoff's role as the manager of all of Ascot's funds and a substantial portion of Ariel's and Gabriel's funds. Merkin gave Madoff complete control and investment discretion over all of Ascot's and a substantial portion of Ariel's and Gabriel's funds. Thus, he had already delegated all investment discretion to this money manager, a fact Merkin was presently aware of at the time of the Offering Memoranda. In addition, given that Merkin admitted that he formed Ascot for the purpose of investing with Madoff and that virtually all of its assets were tendered to him, to the extent that the representations that Merkin would exercise discretion in managing the funds, and the performance of the funds depended on his skill and judgment could be construed "as to the future," the misrepresentations were "beyond reasonable expectation" (GBL § 352-c [1] [b] ). The reference to Madoff's role as a prime broker, as mentioned above, was misleading because such brokers do not make investment management decisions like Madoff was making, and the mischaracterization of Madoff's role was a historical, present known fact. Further, particularly with regard to Ariel and Gabriel, the misrepresentation regarding their present investment strategy of investing in distressed businesses, also referred to a false historical fact. Defendants have failed to show that no reasonable investor could have been mislead about the nature of the risk when he or she invested ( *P. Stolz Family Partnership, L.P. v. Daum,* 355 F3d at 97). This cautionary language also does not address the other misrepresentations and omissions, such as Merkin's failure to exercise judgment in supervising the delegation of investment management to Madoff, his failure to conduct due diligence, and to audit Madoff's activities regarding the funds, and the fact that Merkin ignored the warnings of fraud from his own people and from fund investors. Therefore, the existence of the cautionary language

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

does not negate the materiality of the misrepresentations and omissions alleged in the complaint.

The documentary evidence submitted by defendants, consisting of e-mails from about 10 investors, indicating that these investors were aware that monies were invested with Madoff, fail to demonstrate that dismissal is warranted at this early stage of this action. Whether some of the investors of Ascot, Ariel, and Gabriel were aware that the funds were invested with Madoff, does not bar the AG's claims. The complaint details claims that hundreds of investors were not so aware and therefore the e-mails do not provide a basis for dismissal as a matter of law. Finally, defendants' argument that dismissal is warranted on the ground that the AG cannot show loss causation is also rejected. Loss causation is not an element of a Martin Act claim. A misrepresentation may violate the statute "regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted" (GBL § 352-c [1][c]; *State of New York v. Sonifer Realty Corp.,* 212 A.D.2d at 367). Therefore, the first through third causes of action for violations of the Martin Act are sufficient to withstand this motion to dismiss.

**\*7** The AG's Executive Law claim similarly survives this dismissal motion. Executive Law § 63 (12) gives the AG the power to bring a claim against any person or entity which engages in "repeated fraudulent or illegal acts" or "otherwise demonstrate[s] persistent fraud or illegality in the carrying on ... or transaction of business." Like the Martin Act, the statute broadly construes the definition of fraud "so as to include acts characterized as dishonest or misleading and eliminating the necessity for proof of an intent to defraud" ( *People v. Apple Health and Sports Clubs, Ltd.,* 206 A.D.2d 266, 267 [1st Dept], *lv dismissed in part, denied in part* 84 N.Y.2d 1004 [1994]; *see People v. General Elec. Co.,* 302 A.D.2d 314 [1st Dept 2003] ). The test for fraud thereunder is whether the acts have the capacity or tendency to deceive, or creates an atmosphere conducive to fraud ( *People v. General Elec. Co.,* 302 A.D.2d at 314). Like the Martin Act,

since the repeated fraudulent practices targeted by the statute do not need to constitute fraud in the classic common-law sense, reliance need not be shown ( *State of New York v. Sonifer Realty Corp.,* 212 A.D.2d at 367). The AG may apply for an injunction, and seek restitution and damages (Executive Law § 63[12] ).

As in the Martin Act claims, the allegations here are sufficient to satisfy Executive Law § 63(12). As determined above with regard to the Martin Act claims, Merkin's representations, as alleged in the pleadings, were fraudulent and his omissions were material. In addition, the AG has alleged that the defendants engaged in "repeated" and/or "persistent" fraudulent acts in violation of Executive Law § 63(12). Again, the AG need not show reliance or loss causation with respect to this claim. Therefore, the defendants' motion with regard to the sixth cause of action is denied.

### Not-for-Profit Law Claim

The AG's fourth claim is for violations of the Not-for-Profit Corporation Law §§ 112, 717, and 720. In this claim, the AG alleges that Merkin failed to discharge his duties as an officer or director of "Merkin-Affiliated Non-Profits" with the degree of care, skill, and diligence that an ordinarily prudent person in his position would exercise (Complaint, ¶ 133). These failures included that he received a personal benefit from investments made by "Non-Profit Organizations A, C, and G," failed to disclose that he was actively earning his management fees, failed make diligent inquiries into the risks of investing with Madoff, ignored numerous indications that Madoff was engaging in fraud, and failed to disclose his conflicts of interest (*id.*). The complaint alleges that Merkin was an officer, director, trustee and sat on the investment committees of three non-profits, and collected a personal benefit from the investments made by the two entities referred to as Non-Profit Organizations A and C, on whose board of directors' investment committees he sat, and a third, referred to as Non-Profit Organiza-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

tion G, for which he served as investment advisor ( *id.,* ¶ 5, 65, 120-124, 133). It alleges that Merkin was such a regular at the Investment Committee meeting of Non-Profit Organization G that he was "referred to as the Chair in the minutes," and, as this organization's investment advisor, he created a special relationship of trust as its fiduciary (*id.,* ¶ 123). It further asserts that Merkin and Madoff both were on the Board of Trustees of Non-Profit Organization A, which had a large investment in Ascot. The complaint alleges that Merkin breached his fiduciary duty by accepting Non-Profit Organization A's investment in Ascot, where he would earn a significant management fee, when Merkin could have arranged for a direct investment with Madoff without the extra fees (*id.*). The AG further alleges that Merkin breached his fiduciary duties by concealing Madoff's role in Ascot, Ariel, and Gabriel, by failing to disclose conflicts of interest Merkin had in recommending investments, and by making false statements regarding his fee structure. The complaint asserts that Merkin's conduct breached his fiduciary duties in violation of sections 112, 717 , and 720 of the Not-for-Profit Corporation Law (N-PCL).

**\*8** Defendants challenge this claim, asserting that the AG has failed to plead specifically the non-profit corporation of which Merkin was an officer or director. They contend that the complaint only alleges that he was a trustee of Non-Profit Organization A, and that he sat on the investment committees and served as an investment advisor with regard to Non-Profit Organizations C and G.

N-PCL § 112 authorizes various remedial measures that may be pursued in an action or special proceeding brought by the AG under the N-PCL (N-PCL § 112). Section 720 provides that an action may be brought against a director or officer of a not-for-profit corporation to compel the defendant to account for neglect, failure to perform, or other violation of his duties in the management of corporate assets, and the acquisition by himself or transfer to others, loss, or waste of corporate assets due to

neglect of, failure to perform, or other violation of his duties (N-PCL § 720). Section 720(b) specifically provides that the AG may bring an action for the relief provided in the section.

The fiduciary duties of care and loyalty are the legal standards that govern the conduct of not-for-profit directors and officers in their daily relationship with the not-for-profit corporation they serve (N-PCL § 717 [a] ). Section 102(a)(6) of the N-PCL defines "director" to mean "any member of the governing board of a corporation, whether designated as director, trustee, manager, governor, or by any other title. The term board' means board of directors' (N-PCL § 102[a][6] ).

The complaint, here, adequately pleads that Merkin was a trustee of Non-Profit Organization A, which falls within the definition of director under N-PCL § 102(a)(6). Defendants' submission, at oral argument,[FN1] of the minutes of a meeting of the Board of Trustees for Yeshiva University, which defendants claim is Non-Profit Organization A, at which Merkin attended and spoke as a member of the Board's Investment Committee, supports this conclusion. With regard to the other non-profit organizations designated C and G, this court will not dismiss the claim at this early stage of the litigation. The allegations that Merkin sat on the investment committees of these organizations, and was their investment advisor, even being referred to at one meeting as "Chair," is sufficient at this point.

> FN1. Both parties acknowledge that the documents submitted at oral argument on October 15, 2009 before this court, are subject to a confidentiality stipulation between the parties. Therefore, they will be returned to the defendants. However, the defendants are directed to file redacted copies of these documents for the court file.

Moreover, contrary to defendants' argument, Merkin's alleged breaches of his fiduciary duty, as set forth above, are sufficiently specific. Defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

contention that the claim of undisclosed conflicts of interest should be dismissed based on documentary evidence they submit, is rejected. While the documents submitted at oral argument indicate that Merkin disclosed to Yeshiva University in March 2001 and March 2002 that he had conflicts with regard to Ascot, indicating the fees he collected, it is not clear whether this disclosure was made to the other non-profit corporations (C and G), and it is not clear if Yeshiva University also invested in Ariel and Gabriel, and whether Merkin's fees and conflicts with regard to Ariel and Gabriel were disclosed to any of the Merkin affiliated non-profit corporations. Therefore, because the defendants' documentary evidence does not clearly refute all of the assertions regarding Merkin's failures under the N-PCL, the court concludes that the motion to dismiss this claim also must fail.

**Breach of Fiduciary Duty Claim**

**\*9** The breach of fiduciary duty claim also survives defendants' motion. In this claim, the AG alleges that Merkin utterly failed to manage, supervise, or monitor the investments of Ascot, Ariel, and Gabriel, as he was obligated to as their investment manager. By turning over the funds to Madoff without conducting adequate due diligence, despite information given to Merkin by his own associates, as well as some of the funds' investors, indicating that Madoff may have been engaged in misconduct (*see* Complaint, ¶¶ 107-115), Merkin breached his fiduciary duties to the funds and the investors. The complaint also alleges that while Merkin was aware of certain aspects of Madoff's operations that raised the possibility of fraud by Madoff, including Madoff's use of paper trade confirmations, the secrecy of Madoff's operations, the fact that Madoff was self-clearing, and that his operations were controlled exclusively by himself and close family members (*id.,* ¶ 116), Merkin never questioned Madoff's operations.

Defendants challenge this claim on several grounds. First, they claim that the AG does not have parens

patriae standing. Parens patriae is a common-law doctrine regarding standing. It allows the state to bring an action to prevent harm to its sovereign interests, such as the health, safety, comfort, and welfare of its citizens. To invoke the doctrine, the AG must show: (1) a quasi-sovereign interest in the public's well-being; (2) distinct from that of a particular private party; and (3) injury to a sufficiently substantial segment of the population (*see Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607 [1982]; *see also People v. Grasso,* 11 NY3d 64, 69, n 4 [2008] ). A "quasi-sovereign interest' has been held to consist of a set of interests which the state has in the well-being of its populace" (*State of New York v. McLeod,* 12 Misc.3d 1157[A], \*10, 2006 N.Y. Slip Op 50942[U] ). Courts have held that "a state has a quasi-sovereign interest in protecting the integrity of the marketplace" ( *People v. Grasso,* 11 NY3d at 69 n 4, citing *State of New York v. General Motors Corp.,* 547 F Supp 703 [SD N.Y.1982]; *People v. H & R Block, Inc.,* 16 Misc.3d 1124[A], 2007 N.Y. Slip Op 51562 [U] [Sup Ct, N.Y. County 2007] [Moskowitz, J.], *affd* 58 AD3d 415, 417 [1st Dept 2009] ).

Here, the recovery of damages for aggrieved investors is just a part of the AG's case. The AG's focus is on obtaining injunctive relief designed to "vindicate the State's quasi-sovereign interest in securing an honest marketplace for all consumers" ( *People v. H & R Block, Inc.,* 16 Misc.3d 1124 [A],\* 7, 2007 N.Y. Slip Op 51562[U] ). Specifically, the AG has identified a strong quasi-sovereign interest in ensuring that the "financial markets as a whole, and the hedge fund industry in particular, operate honestly and transparently" (AG's Memorandum of Law, at 23; *see People v. H & R Block, Inc.,* 58 AD3d at 417 ["New York's vital interest in securing an honest marketplace in which to transact business" was a sufficient basis for parens patriae standing]; *People v. Liberty Mut. Ins. Co.,* 52 AD3d 378, 379 [1st Dept 2008]; *see also People v. Coventry First LLC,* 2007 WL 2905486 [Sup Ct, N.Y. County 2007], *affd as mod* 52 AD3d 345, 346 [1st

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

Dept 2008], *affd* 13 NY3d 108 [2009] [upholding parens patriae standing to secure honest marketplace for claims including breach of fiduciary duty] ). The fact that the AG is seeking recovery on behalf of an identifiable group of investors, here, does not require this court to ignore the purpose of this breach of fiduciary duty claim, and to characterize it, as defendants do, as one brought solely to benefit a few private investors (*see People v. H & R Block, Inc.,* 16 Misc.3d 1124[A], * 7, 2007 N.Y. Slip Op 51562[U]; *see also State of New York v. General Motors Corp.,* 547 F Supp at 706-707).

**\*10** With respect to injury to a substantial segment of the population, Merkin's alleged misconduct touched many investors, many of whom are New York State residents. They were not just individuals, but also funds and financial institutions representing individuals, charities, and foundations. This is sufficient to show injury to a substantial segment of the population (*see People v. Liberty Mut. Holding Co.,* 2007 WL 900997 [Sup Ct, N.Y. County 2007], *affd as mod* 52 AD3d 378 [1st Dept 2008] ). Defendants' contention that the AG must show an inability of the allegedly injured individuals to obtain relief in a private suit, is without merit. Case law does not demonstrate such a requirement (*see Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, *supra* ). The fact that some private investors may choose to pursue or not to pursue claims on their own behalf does not detract from the substantial public interest at stake in this action. In addition, it is unclear whether all of the investors can obtain individual relief. Therefore, the AG has shown a sufficient basis for parens patriae standing with regard to the breach of fiduciary duty claim.

The defendants also contend that the Martin Act preempts this claim. They fail, however, to cite cases in support of this argument and this court has found no precedent holding that the Martin Act preempts the AG from bringing a common-law claim. The Martin Act cases to which defendants do cite involve claims brought by private parties, in

which, under certain circumstances, the courts find that to allow such a claim would circumvent the bar to private actions under the Martin Act (*see Horn v. 440 East 57th Co.,* 151 A.D.2d 112, 120 [1st Dept 1989]; *In re Bayou Hedge Fund Litig.,* 534 F Supp 2d 405 [SD N.Y.2007], *affd* 573 F3d 98 [2d Cir2009]; *Kassover v. UBS AG,* 619 F Supp 2d 28 [SD N.Y.2008] [AG has exclusive jurisdiction to enforce the Martin Act]; *but see Caboara v. Babylon Cove Dev., LLC,* 54 AD3d 79 [2d Dept 2008] [individual's common-law fraud claim, resting on same facts as Martin Act, not preempted, so long as satisfies pleading standards]; *Scalp & Blade, Inc. v. Advest, Inc.,* 281 A.D.2d 882, 883 [4th Dept 2001] [breach of fiduciary duty claim not preempted by Martin Act). The Martin Act preemption doctrine is to preserve the AG's exclusive jurisdiction to enforce the statute, and to permit the claim here does not undermine that exclusive enforcement jurisdiction. In fact, the AG has pursued Martin Act claims along with common-law claims, including claims for breach of fiduciary duty (*see e.g. People v. Coventry First LLC,* 13 NY3d 108, *supra* [Martin Act claims and breach of fiduciary duty and fraud claims permitted to proceed together]; *compare People v. H & R Block, Inc.,* 158 AD3d 415, *supra* [Executive Law § 63(12) claims pursued with breach of fiduciary duty and fraud claims] ).

Defendants' reliance on *People v. Grasso* (11 NY3d at 70) to urge that the principles that govern private parties regarding preemption based on the Martin Act, must be applied to the AG's claim here, is misplaced. The *Grasso* case was brought by the AG under the N-PCL. The AG asserted non-statutory claims against Richard Grasso, as an officer or director of a non-profit corporation, the NYSE, based on specific provisions of the N-PCL. The Court determined that the Legislature's comprehensive enforcement scheme in the N-PCL required a finding of fault-that the officer or director lacked good faith in executing his duties. It found that the nonstatutory claims asserted in that action, based on specific N-PCL statute provisions, were devoid of any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

fault-based elements. Thus, the nonstatutory claims had a lower burden of proof than that specified by the statute, overriding the Legislature's fault-based scheme. As such, the Court found that they were fundamentally inconsistent with the N-PCL, and reached beyond the bounds of the AG's authority. In the instant case, the breach of fiduciary duty claim is not based specifically on any Martin Act provisions, or, for that matter, on any provisions in the N-PCL. Moreover, the Martin Act, like the breach of fiduciary duty claim, does not require deceitful intent (*see Horn v. 440 East 57th Co.,* 151 A.D.2d at 120). Therefore, there is no inconsistency between the statutory Martin Act claims, and the breach of fiduciary duty claim.Finally, the fifth cause of action sufficiently states a claim for breach of fiduciary duty. To state a claim for breach of fiduciary duty, a plaintiff must plead: (1) the existence of a fiduciary duty between the parties; (2) a breach of that duty; and (3) damages resulting from the breach (*see People v. H & R Block, Inc.,* 16 Misc.3d 1124[A], * 7, 2007 N.Y. Slip Op 51562[U] ). The AG has adequately pled this claim against Merkin by asserting that, as the General Partner of Ascot Partners and Gabriel Capital, L.P., the two domestic funds, he had fiduciary duties to his investors. In fact, in his testimony to the AG, Merkin admitted that he had "fiduciary responsibilities for oversight of the portfolios" (Complaint, ¶ 24 and Exhibit 1 annexed thereto, at 101). With regard to the offshore funds, Ariel and Ascot Fund Limited, investment advisors, such as Merkin, owe fiduciary duties to their clients, particularly where the investment advisor has broad discretion to manage the client's investments (*see EBC I, Inc. v. Goldman Sachs & Co.,* 5 NY3d 11, 19-20 [2005] [underwriter as expert advisor with regard to market conditions held to owe fiduciary duty]; *Brooks v. Key Trust Co. Natl. Assn.,* 26 AD3d 628 [3d Dept 2006], *lv dismissed* 6 NY3d 891 [2006] [financial advisor with discretionary authority to act owes a fiduciary duty]; *Rasmussen v. A.C.T. Environmental Services Inc.,* 292 A.D.2d 710, 712 [3d Dept 2002] [investment advisor owes fiduciary duty]; *Bullmore v. Banc of Amer. Securities LLC,* 485 F Supp 2d 464, 470-471 [SD N.Y.2007]; *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC,* 376 F Supp 2d 385, 413-414 & n 182 [SD N.Y.2005] [collecting cases] ). Individuals in positions of trust, such as "investment advisors, are subject to liability for breach of fiduciary duty when they deceive or defraud their clients" ( *Bullmore v. Banc of Am. Securities LLC,* 485 F Supp 2d at 471). Merkin was the investment advisor and manager to the investors of all four of the funds, and he had complete discretion with regard to how the monies were invested. The relationship created by the Offering Documents imposed on Merkin a duty to act with care and loyalty independent of the terms of those agreements.

**\*11** Defendants urge that this claim should be dismissed because it may not be asserted individually by shareholders of a Cayman Islands corporation. *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC* (376 F Supp 2d 385, *supra* ) is instructive. In that case, individual investors in hedge funds sued the limited liability companies issuing the funds and their principals, alleging, among other claims, that the defendants had breached their fiduciary duties to the investors. The court rejected the defendants' argument that the wrong belonged only to the corporation. It found that the wrong was a fraud committed on the shareholders rather than on the funds, in that defendants had fraudulently overstated the net asset value of the funds, concealing the declines in the fund assets, and the investors were injured when they invested or retained their investments in reliance upon the misstatements (*id.* at 409). Here, the wrongs alleged include Merkin's misrepresentations and omissions regarding what the investors were investing in, and what his role would be in managing the funds, his affirmative misrepresentations to investors after he had already delegated all authority and discretion to Madoff, and his failure to perform due diligence and ignoring signs of fraud. These alleged wrongs were a fraud committed on the shareholder investors rather than on the funds, and the investors were injured when they invested or retained their investments in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

**(Table, Text in WESTLAW), Unreported Disposition**
**(Cite as: 26 Misc.3d 1237(A), 2010 WL 936208 (N.Y.Sup.))**

reliance upon the misstatements.

Defendants' argument that there was no breach because the documents permitted Merkin to delegate his duties to other money managers without notice, lacks merit. The breach of fiduciary duty is not that he was permitted to and did delegate to other money managers. The breach alleged is based on Merkin's misrepresentations regarding his role in purportedly managing the funds and in conducting due diligence with regard to the investments, and in his concealment, both before and after the delegation of all or a portion of the funds to Madoff, that the funds were with Madoff. To the extent that the Offering Documents and Partnership Agreements with regard to Gabriel and Ascot Partners provide that Merkin's liability is limited to "bad faith, gross negligence, recklessness, fraud, or intentional misconduct" the breach of fiduciary duty claim for those investors may be so limited.

### *Injunctive Relief*

Finally, defendants fail to demonstrate a basis to strike the AG's request for injunctive relief. It is entirely premature to determine whether the AG will be entitled to an injunction, and the extent of any such injunction under the Martin Act, the Executive Law § 63(12), or the Not-for-Profit Law. The exact nature of injunctive relief that may be awarded will await further determination of the claims.

### *CONCLUSION*

The court has considered the remainder of defendants' arguments and finds them to be without merit.

Accordingly, the motion to dismiss is denied in its entirety.

N.Y.Sup.,2010.
People ex rel. Cuomo v. Merkin
26 Misc.3d 1237(A), 907 N.Y.S.2d 439, 2010 WL 936208 (N.Y.Sup.), Blue Sky L. Rep. P 74,821, 2010 N.Y. Slip Op. 50430(U)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.